## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                               )
RAND PAUL, *et al.*,                           )
                                               )
                          Plaintiffs,          )
                                               )
                 v.                            )        Civil Action No.
                                               )        1:14-cv-0262-RJL
BARACK OBAMA, President of the                 )
   United States, *et al.*,                    )
                                               )
                          Defendants.          )
_____)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Dated: May 2, 2014

STUART F. DELERY
Assistant Attorney General
JOSEPH H. HUNT
Director, Federal Programs Branch
ANTHONY J. COPPOLINO
Deputy Branch Director
JAMES J. GILLIGAN
Special Litigation Counsel
MARCIA BERMAN
Senior Trial Counsel
BRYAN DEARINGER
Trial Attorney
RODNEY PATTON
Trial Attorney
JULIA BERMAN
Trial Attorney

U.S Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W., Room 6102
Washington, D.C.  20001
Phone: (202) 514-3358
Fax: (202) 616-8470

Counsel for Defendants

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................................................................1

STATEMENT OF FACTS ..................................................................................................4

Section 215 of the USA-PATRIOT Act ............................................................................4

The Section 215 Telephony Metadata Program.................................................................6

Plaintiffs' Complaint.........................................................................................................12

ARGUMENT .....................................................................................................................14

I.    PLAINTIFFS HAVE NOT ESTABLISHED THEIR STANDING TO SUE ..................14

    A.    The Requirements of Article III Standing ............................................................14

    B.    Plaintiffs' First Amended Complaint Does Not Allege Specific Facts
        Sufficient To Establish Their Standing..................................................................16

        1.    Plaintiffs do not allege facts from which it can be concluded
            that records of their calls have been collected or reviewed ......................16

        2.    The Court's reasoning in *Klayman v. Obama* should not be
            followed here .............................................................................................20

II.   THE SECTION 215 TELEPHONY METADATA PROGRAM DOES NOT
    VIOLATE PLAINTIFFS' FOURTH AMENDMENT RIGHTS ......................................25

    A.    Plaintiffs Have No Protected Privacy Interest in Telephony Metadata ................26

    B.    The Telephony Metadata Program Is Reasonable .................................................36

CONCLUSION..................................................................................................................38

i

## TABLE OF AUTHORITIES

**CASES**                                                            **PAGE(S)**

*ACLU v. Clapper*,
    959 F. Supp. 2d 724 (S.D.N.Y.) ............................................................................ *passim*

*In re Application of the FBI for an Order Requiring the Production of Tangible Things*,
    Dkt. No. BR-14-01 (F.I.S.C. Feb. 15, 2014) ....................................................................8

*In re Application of the FBI for an Order Requiring the Production of Tangible Things*
    *[etc.]*, Dkt. No. BR 13-80 (F.I.S.C. Apr. 25, 2013) .......................................................6, 7

*In re Application of the FBI for an Order Requiring the Production of Tangible Things*
    *from [Redacted]*, Dkt. No. BR 13-109, Amended Mem. Op. (F.I.S.C.
    Aug. 29, 2013) ............................................................................................ *passim*

*Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*,
    536 U.S. 822 (2002) ........................................................................................37

*Bond v. United States*,
    529 U.S. 334 (2000) ........................................................................................29

*Brown v. FBI*,
    793 F. Supp. 2d 368 (D.D.C. 2011) ........................................................................ *passim*

*Clapper v. Amnesty Int'l USA*,
    133 S. Ct. 1138 (2013) .................................................................................... *passim*

*Clark-Williams v. Local 689, Amalgamated Transit Union*,
    2014 WL 1571285 (D.D.C. Apr. 21, 2014) .......................................................................6

*Coalition for Underground Expansion v. Mineta*,
    333 F.3d 193 (D.C. Cir. 2003) ...............................................................................17

*Conopco, Inc. v. Roll Int'l*,
    231 F.3d 82, 86 (2d Cir. 2000) ...............................................................................6

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006) ....................................................................................14, 18

*Devlin v. Scardelletti*,
    536 U.S. 1 (2002) ...........................................................................................15

*In re Directives*,
    551 F.3d 1004 (FISC-R 2008) ...............................................................................37

*Edwards v. Aurora Loan Servs., Inc.*,
  791 F. Supp. 2d 144 (D.D.C. 2011) ..................................................................15

*Food and Water Watch v. EPA*,
  2013 WL 6513826 (D.D.C. Dec. 13, 2013) ........................................15, 17, 25

*In re Grand Jury Proceedings*,
  827 F.2d 301 (8th Cir. 1987) .........................................................................32

*Haig v. Agee*,
  453 U.S. 280 (1981) .......................................................................................37

*Harpole Architects, P.C. v. Barlow*,
  668 F. Supp. 2d 68 (D.D.C. 2009) ...........................................................15, 22

*Horton v. California*,
  496 U.S. 128 (1990) .......................................................................................24

*Johnson v. Quander*,
  440 F.3d 489 (D.C. Cir. 2006) .......................................................................23

*Katz v. United States*,
  389 U.S. 347 (1967) ..........................................................................26, 27, 28

*Klayman v. Obama*,
  957 F. Supp. 2d 1 (D.D.C. 2013) ............................................................ *passim*

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) .........................................................................14, 15, 24

*Maryland v. King*,
  133 S. Ct. 1958 (2013) ...................................................................................37

*NTEU v. Von Raab*,
  489 U.S. 656 (1989) ..................................................................................36, 38

*Nat'l Tobacco Co. v. Dist. of Columbia*,
  2011 WL 4442771 (D.D.C. Sept. 14, 2011) ..................................................15

*Quon v. Arch Wireless Operating Co., Inc.*,
  529 F.3d 892 (9th Cir. 2008) .........................................................................28

*Raines v. Byrd*,
  521 U.S. 811 (1997) .......................................................................................14

*Rakas v. Illinois,*
  439 U.S. 128 (1978)..............................................................................................31, 34

*Reporters Comm. for Freedom of the Press v. AT&T,*
  593 F.2d 1030 (D.C. Cir. 1978).........................................................................28

*SEC v. Jerry T. O'Brien, Inc.,*
  467 U.S. 735 (1984)...........................................................................................29

*In re Sealed Case,*
  310 F.3d 717 (FISC-R 2002) ............................................................................37

*Smith v. Maryland,*
  442 U.S. 735 (1979).................................................................................. *passim*

*Steagald v. United States,*
  451 U.S. 204 (1981)...........................................................................................31

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998).............................................................................................16

*Texas v. Brown,*
  460 U.S. 730 (1983)...........................................................................................24

*Tootle v. Sec'y of the Navy,*
  446 F.3d 167 (D.C. Cir. 2006) ..........................................................................17

*U.S. Telecom Ass'n v. FCC,*
  227 F.3d 450 (D.C. Cir 2000) ...........................................................................28

*United States ex rel. Shea v. Verizon Bus. Network Servs., Inc.,*
  904 F. Supp. 2d 28 (D.D.C. 2012) ....................................................................17

*United States v. Banks,*
  3 F.3d 399 (11th Cir. 1993) ...............................................................................24

*United States v. Baxter,*
  492 F.2d 150 (9th Cir. 1973) .............................................................................28

*United States v. Clutter,*
  674 F.3d 980 (8th Cir. 2012) .............................................................................24

*United States v. Dionisio,*
  410 U.S. 1 (1973)...............................................................................................32

iv

*United States v. Doe*,
    537 F. Supp. 838 (E.D.N.Y. 1982) ...................................................................28

*United States v. Fithian*,
    452 F.2d 505 (9th Cir. 1971) .........................................................................28

*United States v. Forrester*,
    512 F.3d 500 (9th Cir. 2008) .........................................................................28

*United States v. Jacobsen*,
    466 U.S. 109 (1984).................................................................................23, 36

*United States v. Jones*,
    132 S. Ct. 945 (2012) ........................................................................... *passim*

*United States v. Licata*,
    761 F.2d 537 (9th Cir. 1985) .........................................................................24

*United States v. Merrick Sponsor Corp.*,
    421 F.2d 1076 (2d Cir. 1970)...........................................................................6

*United States v. Miller*,
    425 U.S. 435 (1976)............................................................................. *passim*

*United States v. Moalin*,
    2013 WL 6079518 (S.D. Cal. Nov. 18, 2013) ...................................................25

*United States v. Place*,
    462 U.S. 696 (1983)................................................................................23, 36

*United States v. Reed*,
    575 F.3d 900 (9th Cir. 2009) .........................................................................28

*United States v. Rigmaiden*,
    2013 WL 1932800 (D. Ariz. May 8, 2013) .......................................................32

*United States v. U.S. Dist. Court (Keith)*,
    407 U.S. 297 (1972)......................................................................................37

*United States v. VanLeeuwen*,
    397 U.S. 249 (1970)......................................................................................24

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State*,
    454 U.S. 464 (1982)......................................................................................14

*Vernonia Sch. Dist. 47J v. Acton,*
   515 U.S. 646 (1995)..............................................................................................................37

*Whitmore v. Arkansas,*
   495 U.S. 149 (1990)..............................................................................................................18

**STATUTES**

50 U.S.C. § 1861................................................................................................ *passim*

50 U.S.C. § 1862....................................................................................................................5

Pub. L. No. 107-56, 115 Stat. 272 (2001)....................................................................................4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
RAND PAUL, *et al.*,                    )
                                        )
                    Plaintiffs,         )
                                        )        No. 1:14-cv-262-RJL
          v.                            )
                                        )
BARACK OBAMA, President of the          )
     United States, *et al.,*           )
                                        )
                    Defendants.         )
_____)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## INTRODUCTION

One of the greatest challenges the United States faces in combating international terrorism and preventing potentially catastrophic terrorist attacks on our country is identifying terrorist operatives and networks, particularly those operating within the United States.  The Government's exploitation of terrorist communications is a critical tool in this effort.  Plaintiffs in this case asks this Court to invalidate an important means by which the National Security Agency (NSA), acting under authority of the Foreign Intelligence Surveillance Court (FISC), has gathered information about communications among known and unknown terrorist actors in order to thwart future terrorist attacks.

Plaintiffs challenge the NSA's collection, under a provision of the Foreign Intelligence Surveillance Act (FISA) known as Section 215, of bulk "telephony metadata," contained in business records created by telecommunications service providers for their own business purposes, that include such information as the time and duration of calls made, and the receiving and dialing numbers, but not the content of calls or any persons' names or addresses.  Collection and targeted querying of these records—which have been repeatedly authorized by the FISC as

consistent with governing laws and the Constitution—permit NSA analysts, acting under strict controls imposed by FISC orders (controls which, at the direction of the President, and with the approval of the FISC, have recently become even more rigorous) to detect communications between foreign terrorists and any of their contacts located in the United States.  The NSA is prohibited from using the records for any other purpose.

Plaintiffs' complaint asserts a single claim: that this activity violates their Fourth Amendment rights.  For the reasons discussed herein, the Court lacks jurisdiction to entertain this claim, and the claim fails to state grounds on which relief can be granted.

First, Plaintiffs fail to meet their burden of alleging facts sufficient to establish their standing.  Plaintiffs allege that the Government has "seized, stored, retained, and periodically searched telephone metadata concerning every domestic or international phone call [they] made or received since at least May 2006."  First Am. Class Action Compl. for Declaratory & Injunctive Relief (ECF No. 17) ("FAC"), ¶¶ 4, 5.  But Plaintiffs allege no facts to support this assertion.  Although the Section 215 telephony metadata program is broad in scope and involves the aggregation of metadata collected from multiple telecommunications companies, the program has never collected information on all (or virtually all) telephone calls made and/or received in the United States.  Nor is Plaintiffs' standing established by their allegation that they are subscribers of telecommunications services provided by AT&T and Verizon Wireless.  There are no allegations in the complaint that either of these companies is now or ever has been a participating provider in the program.  The Government has only confirmed the participation, for the duration of one, now-expired FISC order, of Verizon Business Network Services, Inc., a separate business entity from Verizon Wireless.  Otherwise, the identities of any carriers participating in the program at any time remains properly classified.

2

Beyond the issue of collection, Plaintiffs' allegations of injury from the querying of metadata collected under the telephony metadata program are even more threadbare.  They assert that telephony metadata can be used, in conjunction with publicly available information, to glean personal information about individuals and their associations.  Plaintiffs have not alleged, nor could they plausibly do so given the strict legal constraints on the NSA's access to and use of the metadata, that anyone at the NSA has reviewed metadata pertaining to their calls.  Indeed, only a tiny fraction of the metadata is ever seen by any person.  Thus it is sheer speculation to suggest that records of calls to or from Plaintiffs have been or ever will be retrieved or reviewed, much less that the Government uses the telephony metadata program to glean personal information about Plaintiffs or their associations.

Second, Plaintiffs' claim fails on the merits.  Plaintiffs' Fourth Amendment claim is foreclosed by *Smith v. Maryland*, 442 U.S. 735 (1979), which held that there is no reasonable expectation of privacy for purposes of the Fourth Amendment in the telephone numbers dialed in order to connect a telephone call.  Thus, the Government does not conduct a Fourth Amendment "search" when it collects such telephony metadata, nor does it "seize" Plaintiffs' property when telecommunications companies provide their own business records to the Government under orders of the FISC.  The reasoning of *Smith*—that telephone subscribers voluntarily convey dialing information to the telephone company and therefore assume the risk that the telephone company will reveal that information to the Government—is fully applicable here, as all courts to consider the question, save this Court in *Klayman v. Obama*, 957 F. Supp. 2d 1 (D.D.C. 2013), have concluded.  As the FISC recently held, neither the greater volume of metadata at issue here nor changes in technology since 1979 provide a basis on which to disregard the controlling authority of *Smith*.

Even if Plaintiffs had a reasonable expectation of privacy in business records held by a third party, Plaintiffs have not alleged an invasion of that privacy interest, and in any event the telephony metadata program is reasonable, and therefore lawful, under Fourth Amendment "special needs" analysis.  That analysis requires a balancing between the minimal privacy interests involved in the collection of non-content telephony metadata, and the Government's important interest in identifying and tracking terrorist operatives.  That balance tilts in favor of the constitutionality of the telephony metadata program.

For these reasons, discussed more fully below, Defendants respectfully submit that the Court should not follow the decision in *Klayman v. Obama* in this matter, and the complaint should be dismissed.

## STATEMENT OF FACTS

### Section 215 of the USA-PATRIOT Act

Congress enacted FISA to authorize and regulate certain governmental surveillance of communications and other activities conducted to gather foreign intelligence.  FISA's "business records" provision, 50 U.S.C. § 1861, enacted by Section 215 of the USA PATRIOT Act, Pub. L. No. 107-56, 115 Stat. 272 (2001), authorizes the Government to apply to the Foreign Intelligence Surveillance Court (FISC), an Article III court composed of appointed U.S. district judges, *id.* § 1803, for an order requiring the "production of any tangible things (including books, records, papers, documents, and other items) for an investigation [1] to obtain foreign intelligence information not concerning a United States person or [2] to protect against international terrorism or clandestine intelligence activities."  *Id*. § 1861(a)(1).  Section 215 requires that the application include "a statement of facts showing that there are reasonable grounds to believe that the tangible things sought are relevant to an authorized investigation."

*Id.* § 1861(b)(2)(A).[1]  If the Government makes the requisite factual showing, a FISC judge "shall enter an ex parte order as requested, or as modified, approving the release of tangible things."  *Id.* 1861(c)(1).

Section 215 was "designed to ensure not only that the government has access to the information it needs for authorized investigations, but also that there are protections and prohibitions in place to safeguard U.S. person information." *In re Application of the FBI for an Order Requiring the Production of Tangible Things from [Redacted]*, Dkt. No. BR13-109, Am. Mem. Op. at 9 (F.I.S.C. Aug. 29, 2013) (publicly released, unclassified version) ("Aug. 29, 2013 FISC Op.") (Exhibit 1, hereto).  The statute protects U.S. person information by requiring compliance with "minimization procedures."  Information contained in the records or other items received in response to a Section 215 order "concerning any United States person may be used and disclosed by [the Government] without the consent of [that] person only in accordance with . . . minimization procedures," adopted by the Attorney General and enumerated in the Government's application, that "minimize the retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons consistent with the need . . . to obtain, produce, and disseminate foreign intelligence information."  50 U.S.C. § 1861(b)(2)(B), (g)(2), (h).  The FISC must find these requirements have been met before it issues the requested order, which must direct that the minimization procedures set forth in the application be followed.  *Id.* § 1861(c)(1).[2]

---

[1]  The investigation must be authorized and conducted under guidelines approved by the Attorney General under Executive Order 12,333 or a successor thereto.  *Id.* § 1861(a)(2)(A), (b)(2)(A).

[2]  In addition, Section 215 provides for a recipient of a production order to challenge it in court, *id.* § 1861(f)(2), and for congressional oversight.  *Id.* § 1862(a) (requiring the Attorney General to report all requests made to the FISC under Section 215 to the House and Senate Intelligence and Judiciary Committees); *see also id.* §§ 1862(b) and (c), 1871(a)(4).

**The Section 215 Telephony Metadata Program**

Plaintiffs challenge the Government's FISC-authorized acquisition and analysis of bulk telephony metadata under Section 215 for purposes of discovering communications with and among unknown terrorist operatives.  Under this program, the Government has since May 2006 obtained orders from the FISC directing certain telecommunications service providers to produce their "call detail" records, which are records created and maintained by the telecommunications service providers for their own business purposes.  Call detail records contain information about telephone calls known as metadata—for example, the date and time a call was made, the dialing and receiving numbers, and the date, time, and duration of the call—but not the substantive content of the call.  Decl. of Teresa H. Shea, Signals Intelligence Director, NSA, in Support of Opp'n to Mot. for Preliminary Injunction ("Shea Decl.") (Exhibit 2, hereto), ¶¶ 7, 13–15, 18, Dkt. 63, *ACLU v. Clapper*, 959 F. Supp. 2d 724 (S.D.N.Y. 2013); *In re Application of the FBI for an Order Requiring the Production of Tangible Things [etc.]*, Dkt. No. BR 13-80 (F.I.S.C. Apr. 25, 2013) ("Secondary Order") (Exh. B to Shea Decl.) at 1–2.[3]

Although the Government has acknowledged that the Section 215 telephony metadata program is broad in scope and involves the collection and aggregation of a large volume of data from multiple telecommunications service providers, the program has never captured information on all (or virtually all) calls made and/or received in the U.S.  Public speculation to

---

[3] The Court may consider the Shea declaration in deciding Defendants' motion to dismiss because Plaintiffs have incorporated it by reference into their First Amended Complaint.  FAC ¶ 17 n.4; *see, e.g.*, *Clark-Williams v. Local 689, Amalgamated Transit Union*, 2014 WL 1571285, at *2 (D.D.C. Apr. 21, 2014) ("In ruling upon a motion to dismiss, a court may consider the facts alleged in the Complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice) (internal quotation marks and citations omitted).  The Court may take judicial notice of the publicly available portions of FISC orders as official judicial acts. *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 n.3 (2d Cir. 2000); *United States v. Merrick Sponsor Corp.*, 421 F.2d 1076, 1079 n.2 (2d Cir. 1970).

that effect is untrue.  Decl. of Teresa H. Shea, Signals Intelligence Director, NSA, at ¶ 8 ("*Paul Shea Decl.*") (Exhibit 3, hereto).  The FISC has also explained that the Government does not acquire call detail records relating to all telephone calls to, from, or within the United States. Aug. 29, 2013 FISC Op. at 4 n.5 ("production of all call detail records of all persons in the United States has never occurred under this program.").

Under the FISC orders "telephony metadata" is defined as "comprehensive communications routing information" including but not limited to "originating and terminating telephone number[s], International Mobile Subscriber Identity (IMSI) number[s], International Mobile Station Equipment Identity (IMEI) number[s], trunk identifier[s], telephone calling card numbers, and time and duration of call."  *In re Application of the FBI for an Order Requiring the Production of Tangible Things*, Dkt. No. BR 13-80, Primary Order (F.I.S.C. Apr. 25, 2013) ("Primary Order") (Exh. A to Shea Decl.) at 3 n.1; *see also* Secondary Order at 2.  The FISC orders expressly exclude "the name, address, or financial information of a subscriber or customer," or any party to a call, from the definition of telephony metadata.  Primary Order at 3 n.1.; Secondary Order at 2.  The FISC orders also do not permit the Government, under this program, to listen to or record the contents of any telephone conversations, or to acquire cell site locational information.  Shea Decl.  ¶¶ 7, 15.  Under the FISC orders, the NSA's authority to continue the program expires after approximately 90 days and must be renewed.  The FISC first authorized the program in May 2006, and since then has renewed the program thirty-six times, under orders issued by sixteen different FISC judges.  *Paul* Shea Decl. ¶ 7.[4]

---

[4] The Government obtains these orders from the FISC by submitting applications explaining that the records are sought for investigations to protect against international terrorism that concern specified foreign terrorist organizations identified in each application.  *See* 50 U.S.C. § 1861(a)(1), (b)(2)(A).  The FISC orders are based on the court's findings that there are "reasonable grounds to believe that the [records] sought are relevant to authorized investigations

The Government uses the telephony metadata it collects under this program to create a historical repository of information from multiple telecommunications networks that is then used to ascertain whether international terrorist organizations under investigation are communicating with operatives in the United States, for the purpose of detecting and preventing intended terrorist attacks.  Shea Decl. ¶¶ 44–63; Aug. 29, 2013 FISC Op. at 18–22.  When there is reasonable, articulable suspicion—as determined by a federal judge under the most recent FISC orders—that a selector, such as a telephone number, is associated with a terrorist organization being investigated by the Government, NSA analysts may then and only then, conduct contact chain queries to obtain telephone numbers (or other metadata) that have been in contact within two steps, or "hops," of the suspected-terrorist selector (again, under the most recent FISC orders).  Shea Decl. ¶¶ 26, 46–47.[5]  When a selector is reasonably believed to be used by a United States person, a determination must be made that the selector was not regarded as associated with a terrorist group solely on the basis of activities protected by the First Amendment.  Shea Decl. ¶¶ 20–24, 32; Primary Order at 6–9; *In re Application of the FBI for an Order Requiring the Production of Tangible Things*, Dkt. No. BR 14-01 (FISC Feb. 15, 2014) (Feb. 15, 2014 FISC Order) (*Paul* Shea Decl., Exh. A).

The requirement of reasonable, articulable suspicion, known as "RAS," is a crucial minimization procedure that bars indiscriminate querying of the telephony metadata based on selectors not connected with terrorist activity.  Primary Order at 4 ("The government is hereby prohibited from accessing business records metadata acquired pursuant to this Court's orders . . . for any purpose except as described herein."); *id*. at 6 ("NSA shall access the [business records]

_____

(other than threat assessments) being conducted by the FBI . . . to protect against international terrorism."  Primary Order at 1–2.

[5] The first step represents an immediate contact of the suspected-terrorist selector; the second step represents an immediate contact of the first-step contact.  Shea Decl. ¶ 22.

metadata for purposes of obtaining foreign intelligence information only through contact chaining queries . . . using selection terms approved as 'seeds' pursuant to the RAS approval process . . . ."); Aug. 29, 2013 FISC Op. at 5 n. 7 ("A selection term that meets specific legal standards has always been required.  This Court has not authorized government personnel to access the data for the purpose of wholesale 'data mining' or browsing."); 50 U.S.C. § 1861(c)(1) and (g).  Because of this requirement, the vast majority of the data obtained under this program is never reviewed by any person.  In 2012, for example, NSA analysts used fewer than 300 suspected-terrorist selectors, and the number of records responsive to such queries was a very small percentage of the total volume in the database.  Shea Decl. ¶¶ 23–24.  And when a query based on reasonable, articulable suspicion is performed, the information it returns does not include the names or addresses of persons associated with the responsive telephone numbers, because that information is not included in the database in the first place.  *Id.* ¶¶ 21, 43.

While NSA may ascertain identifying information for, and only for, the metadata returned by a FISC-approved selector under the reasonable, articulable suspicion standard, the Government does not use the results of such queries to compile comprehensive records or dossiers, even on suspected terrorists.  Rather, the Government uses those results in conjunction with a range of analytical tools to ascertain those contacts that may be of use in identifying individuals who may be associated with certain foreign terrorist organizations because they have been in communication with certain suspected-terrorist telephone numbers or other selectors.  *Id.* ¶¶ 26–28.  Furthermore, the FISC's orders authorizing the program strictly prohibit the NSA from disseminating any information concerning U.S. persons unless a senior NSA official determines that the information is necessary to understand counter-terrorism information or assess its importance.  Primary Order at 13.

9

In addition, to ensure compliance with these safeguards, the FISC's orders impose an extensive regime of internal reporting, audits, and oversight; regular consultation between the NSA Office of the Inspector General and the Department of Justice to assess compliance with FISC requirements; and monthly reports to the FISC including, *inter alia*, a discussion of NSA's application of the "reasonable, articulable suspicion" standard and the number of times query results containing U.S. person information have been shared with anyone outside NSA.  Shea Decl. ¶¶ 34–35; Primary Order at 14–16.

The Government has made public FISC orders and opinions concerning various failures to fully implement and comply with these minimization procedures, owing to human error and technological issues, that were discovered in 2009.  The Government reported these problems to the FISC (and Congress) and remedied them, and the FISC (after temporarily suspending the Government's authority to query the database without the court's approval) reauthorized the program in its current form.[6]  Shea Decl. ¶¶ 36–43.

The substantial protections built into the Section 215 telephony metadata program were further enhanced by two recent modifications to the program announced by the President in January 2014 and adopted in subsequent FISC orders.  Prior to these modifications, FISC orders authorizing the program provided that one of 22 designated NSA officials had to determine that a proposed suspected-terrorist selector met the reasonable, articulable suspicion standard.  Primary

---

[6] The most serious compliance problem involved an "alert list" process by which telephone identifiers that had been associated with foreign terrorist organizations, but which in many cases had not been approved under the "reasonable, articulable suspicion" standard, were used, not as terms to query the metadata archive, but to alert analysts if identifiers associated with foreign terrorist groups were in contact with someone in the United States.  Analysts could not query the database using these "alert list" identifiers to learn what numbers they had been in contact with unless and until they were approved under the "reasonable, articulable suspicion" standard.  Shea Decl. ¶ 37.  (Other compliance incidents have occurred since 2009, due to human error and technology issues, although not on the same scale as the incidents discovered in 2009.  All have likewise been reported to the FISC and appropriately remedied.)

Order at 7.  The FISC orders also permitted query results to include metadata up to three steps (or hops) away from the query selector.  Shea Decl. ¶ 22.

In January the President announced that he was directing the Government to take immediate steps to implement two changes to the program.  Remarks by the President on Review of Signals Intelligence, http://www.whitehouse.gov/the-press-office/2014/01/17/ remarks-president-review-signals-intelligence.  The first requires advance findings by the FISC of reasonable, articulable suspicion that a selector used to query the metadata is associated with a foreign terrorist organization (except in emergency situations, in which case the Government must seek retrospective FISC approval of the selector).  The second limits query results to metadata within two "hops" (rather than three) of the suspected terrorist selector.  In February, the FISC granted the Government's motion to implement those two changes to the Section 215 program.  *See* Feb. 15, 2014 FISC Order, Exhibit A to *Paul* Shea Decl.; *Paul* Shea Decl. ¶¶ 3-5.

On March 27, 2014, the President further announced, after having considered options presented to him by the Intelligence Community and the Attorney General, that he will seek legislation to replace the Section 215 bulk telephony-metadata program.  Statement by the President on the Section 215 Bulk Metadata Program,  http://www.whitehouse.gov/the-press-office/2014/03/27/statement-president-section-215-bulk-metadata-program (3/27 President Statement).  The President stated that his goal was to "establish a mechanism to preserve the capabilities we need without the government holding this bulk metadata" to "give the public greater confidence that their privacy is appropriately protected," while maintaining the intelligence tools needed "to keep us safe."  *Id.*  Instead of the Government obtaining business records of telephony metadata in bulk, the President proposed that telephony metadata should remain in the hands of telecommunications companies.  *Id.*  The President stated that "legislation

11

will be needed to permit the government to obtain information with the speed and in the manner that will be required to make this approach workable." *Id.* Under such legislation, the Government would be authorized to obtain telephony metadata from the companies pursuant to individualized orders from the FISC. The President explained that, in the meantime, the Government would seek from the FISC a 90-day reauthorization of the existing Section 215 program, with the two modifications already approved by the FISC in February, and the court has since entered an order reauthorizing the program as modified. *See Paul* Shea Decl. ¶¶6–7.

### **Plaintiffs' Complaint**

Plaintiffs are U.S. Senator Rand Paul and Freedom Works, Inc., an alleged non-profit corporation. They claim that the Section 215 telephony metadata program violates their rights under the Fourth Amendment to the United States Constitution. FAC ¶¶ 4, 5. They maintain that they have standing to contest the legality of the program "because Defendants have, without legitimate legal basis, seized, stored, retained, and periodically searched telephone metadata concerning every domestic or international phone call [they] made or received since at least May 2006 . . . ." *Id.* That allegation is based solely on news reports citing unnamed sources that "all major telecommunications companies operating in the United States provide NSA on an ongoing daily basis telephone metadata for all telephone calls . . . ." FAC ¶ 16 & n.3. Plaintiffs also claim to be customers of Verizon Wireless and AT&T, *id.*, but not of Verizon Business Network Services, Inc., the recipient of the April 2013 FISC Section 215 production order that the Government confirmed to be authentic. Secondary Order at 1.

Plaintiffs concede that the NSA can only access the telephony metadata for counter-terrorism purposes. They allege that "[t]he NSA is only to access the metadata to further an international terrorism investigation, and only by querying the entire database with a telephone

number or identifier that is associated with an NSA-suspected foreign terrorist organization on a

list approved by the FISC." *Id.* ¶ 21.  They also acknowledge that the metadata do not include

information about the persons to whom the telephone numbers belong.  *Id.* ¶ 22.  Plaintiffs do

not allege that metadata pertaining to their communications has been returned or reviewed as a

result of any query of the database, or that the NSA has in fact identified them as the parties to

any particular calls.  Plaintiffs claim to have a subjective expectation of privacy in their

telephony metadata that society allegedly views as reasonable, *see, e.g.*, *id.* ¶ 16, and that

telephony metadata can be used together with other, publicly available records, to ascertain "a

person's name, address, driver's license, credit history, social security number, and other

information," as well as "a wealth of detail" about individuals' "familial, political, ideological,

professional, religious, and other associations . . . ."  *Id.* ¶¶ 22, 28.  They do not allege, however,

that NSA analysts have ever reviewed or are imminently likely to review metadata related to

their calls.

      Plaintiffs have sued the President, the Director of National Intelligence, the Director of

the NSA, and the Director of the FBI in their official capacities.  Plaintiffs seek injunctive relief

only, and their sole claim is that the Section 215 telephony metadata program violates their rights

under the Fourth Amendment.  *Id.* ¶ 47.  Plaintiffs ask the Court to enjoin the program, order

Defendants to purge all metadata related to Plaintiffs' calls, certify the case as a class action, and

establish procedures enabling Plaintiffs' counsel to obtain security clearances to conduct

discovery and litigate the case.  *Id.* Prayer for Relief.

      On April 23, 2014, the Government moved for a stay of the proceedings in this case

pending resolution of the Government's appeal to the D.C. Circuit from the preliminary

injunction entered by this Court in *Klayman v. Obama*, No. 1:13-cv-00851 (RJL), ECF No. 21.

Because the very claim in this case—that the Section 215 telephony metadata program violates the Fourth Amendment—is before the D.C. Circuit in that appeal, the Government contended (and still contends) that it would promote judicial efficiency and save the parties' resources for the Court to stay this case.  Plaintiffs advised the Government that they oppose the Government's stay request, *id.* at 1 n.2, and that request remains pending.

## ARGUMENT

This case should be dismissed under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, because Plaintiffs have not established their standing to sue.  Alternatively, the complaint should be dismissed under Rule 12(b)(6) for failure to state a claim on which relief can be granted, as Plaintiffs have not alleged a violation of their Fourth Amendment rights.

## I.     PLAINTIFFS HAVE NOT ESTABLISHED THEIR STANDING TO SUE.

### A.     The Requirements of Article III Standing

"The judicial power of the United States … is not an unconditioned authority to determine the [validity] of legislative or executive acts," but is limited by Article III of the Constitution "to the resolution of 'cases' and 'controversies.'"  *Valley Forge Christian Coll. v. Americans United for Separation of Church & State,* 454 U.S. 464, 471 (1982).  "No principle is more fundamental to the judiciary's proper role in our system of government." *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 341 (2006) (internal quotation marks and citation omitted).  A demonstration by Plaintiffs of their standing to sue "is an essential and unchanging part of the case-or-controversy requirement."  *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992).  While the Supreme Court "ha[s] always insisted on strict compliance with this jurisdictional standing requirement," *Raines v. Byrd,* 521 U.S. 811, 819 (1997), the "standing inquiry has been

especially rigorous when reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (internal quotation marks and citations omitted).  As the Supreme Court observed in *Amnesty International,* it has "often found a lack of standing in cases in which the Judiciary has been requested to review actions of the political branches in the fields of intelligence gathering and foreign affairs." *Id.*

To establish Article III standing, Plaintiffs must seek relief from an injury that is "'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Id.*  Because standing is "an indispensable part of [a] plaintiff's case," *Defenders of Wildlife,* 504 U.S. at 561, Plaintiffs, as the parties invoking federal jurisdiction, bear the burden of establishing these three elements.  *Devlin v. Scardelletti,* 536 U.S. 1, 6–7 (2002).  "[C]onclusory allegations of injury are not the type of general factual allegations from which the Court may presume the specific facts necessary to ensure that the plaintiff has standing, and are insufficient to meet the plaintiff's burden of alleging an injury in fact that is concrete and particularized." *Brown v. FBI*, 793 F. Supp. 2d 368, 378 (D.D.C. 2011) (citation omitted); *Harpole Architects, P.C., v. Barlow*, 668 F. Supp. 2d 68, 78 (D.D.C. 2009).  Indeed, "[b]ecause subject matter jurisdiction focuses on the Court's power to hear a claim, the Court must give the plaintiff's factual allegations closer scrutiny than would be required for a 12(b)(6) motion for failure to state a claim." *Food & Water Watch v. EPA*, 2013 WL 6513826, at *5 (D.D.C. Dec. 13, 2013); *Nat'l Tobacco Co. v. Dist. of Columbia*, 2011 WL 4442771, at *4 (D.D.C. Sept. 14, 2011); *Edwards v. Aurora Loan Servs., Inc.,* 791 F. Supp. 2d 144, 149 (D.D.C. 2011).

If Plaintiffs cannot carry their threshold jurisdictional burden of establishing their standing, "the [C]ourt cannot proceed" and must dismiss the case.  *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 104 (1998).

**B.     Plaintiffs' First Amended Complaint Does Not Allege Specific Facts Sufficient To Establish Their Standing.**

**1.     Plaintiffs do not allege facts from which it can be concluded that records of their calls have been collected or reviewed.**

Plaintiffs' First Amended Complaint should be dismissed because it does not contain sufficient well-pleaded, non-conclusory allegations demonstrating that they have been injured because of the telephony metadata program.  Plaintiffs Paul and FreedomWorks both maintain that they "ha[ve] standing to bring this suit because Defendants have [allegedly] seized, stored, retained, and periodically searched telephone metadata concerning every domestic or international phone call [they] made or received since at least May 2006, and Defendants continue to do so."  FAC ¶¶ 4, 5.  That assertion is in turn predicated on an allegation, expressly made "[u]pon information and belief," that "all major telecommunications companies operating in the United States provide NSA on an ongoing daily basis telephone metadata for all telephone calls on their networks in, to or from the United States . . . ."  *Id.* ¶ 16.

The First Amended Complaint, however, contains no supporting allegations of fact on which to base such a belief, *see Brown, supra*, 793 F. Supp. 2d at 378 ("conclusory allegations" are "insufficient to meet the plaintiff's burden of alleging an injury in fact"), and it is in fact incorrect.  As explained in *Paul* Shea Declaration, although the Government has acknowledged that the Section 215 telephony metadata program is broad in scope and involves the aggregation of an historical repository of data collected from more than one provider, the program has never captured information on all (or virtually all) telephone calls made and/or received in the United

States.  *Paul* Shea Decl. ¶ 8.  As the FISC itself observed in a decision last year, "[t]he production of all call detail records of all persons in the United States has never occurred under [the Section 215 telephony metadata] program."  Aug. 29, 2013 FISC Op. at 4 n.5.[7]  Plaintiffs cannot carry their burden of establishing that metadata pertaining to their telephone calls have been collected based on the erroneous premise that the NSA has obtained data on "all" calls made to, from, or within the United States since May 2006.[8]

The defect in Plaintiffs' assertion of standing is not cured by their allegations that they are subscribers to "both cellular and landline telephone services" provided by "Verizon Wireless and AT&T."  FAC ¶¶ 4, 5.  It cannot be assumed from that fact alone that metadata about Plaintiffs' calls have been produced to the NSA as part of the Section 215 program, because the First Amended Complaint contains no well-pleaded, non-conclusory allegations that either of these companies is now or ever has been a participating provider in the program.  And except for a single, now-expired Secondary Order issued in April 2013 to Verizon Business Network Services, Inc.—a separate business entity from Verizon Wireless, *see, e.g., United States ex rel. Shea v. Verizon Bus. Network Servs., Inc.*, 904 F. Supp. 2d 28, 30 (D.D.C. 2012)—the Government has not declassified or otherwise acknowledged the identities of the carriers

---

[7] When considering a motion to dismiss for lack of subject-matter jurisdiction, a court "is not limited to the allegations contained in the complaint," but may look beyond the pleadings to resolve disputed jurisdictional facts.  *Food and Water Watch*, 2013 WL 6513826, at *5*; see also *Tootle v. Sec'y of the Navy*, 446 F.3d 167, 174 (D.C. Cir. 2006); *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003).

[8] Apparently, Plaintiffs do not seriously allege that the Section 215 telephony metadata program obtains metadata on "all" calls made to and/or from the United States.  While Plaintiffs' Memorandum in Support of [Their] Motion for Class Certification, ECF No. 18-1, at 3, repeats the claim that "all major American telecommunications companies provide [the NSA] with telephone metadata for all telephone calls on their networks," they simultaneously disclaim the plain meaning of the word, and state that their allegation should be taken only as a reference to Defendants' so-called "goal" of obtaining metadata "for every telephone call in, to and from the United States . . . ."  *Id.* at 1 n.1.

participating in the program, either now, or at any time in the past.  *Paul* Shea Decl. ¶ 8.  The

consequences of that gap in the record must befall Plaintiffs, as it is their "burden to prove their

standing by pointing to specific facts, not the Government's burden to disprove standing by

revealing details" of its intelligence programs.  *Amnesty Int'l*, 133 S. Ct. at 1149 n.4.

Even presuming that records of Plaintiffs' calls have been collected under this program,

Plaintiffs' allegations of injury are speculative and conjectural, not actual or imminent, as Article

III requires.  *Amnesty Int'l*, 133 S. Ct. at 1147; *see also DaimlerChrysler,* 547 U.S. at 345;

*Whitmore v. Arkansas,* 495 U.S. 149, 158 (1990).  Plaintiffs acknowledge that when NSA

analysts conduct a query of the database "the results do not identify the individuals or

organizations associated with responsive telephone numbers," but allege that "[w]hen cross-

checked against other public records, telephone metadata can reveal a person's name, address,

driver's license, credit history, social security number, and other information," as well as "a

wealth of detail about Plaintiffs' … familial, political, ideological, professional, religious, and

other associations . . . ."  FAC ¶¶ 22, 28.

The hypothetical possibility that call detail records could be used to identify Plaintiffs or

persons with whom Plaintiffs communicate cannot support their standing.  NSA personnel could

identify Plaintiffs or the persons with whom they speak by phone only by reviewing the metadata

contained in records of calls to or from Plaintiffs (and then, as Plaintiffs acknowledge, taking the

necessary next step of ascertaining the identities of the subscribers whose numbers are

memorialized in the records).  But under the FISC's orders, Government personnel may only

review records responsive to queries initiated using selectors that the FISC has approved based

on reasonable, articulable suspicion that they are associated with specific foreign terrorist

organizations.  *See supra* at 8–9; Primary Order at 6–7.  As a result, only a "tiny fraction" of the

18

records are ever seen by any person.  Shea Decl. ¶ 23.  The First Amended Complaint contains

no allegations that the NSA has accessed or reviewed records of Plaintiffs' calls as a result of

queries made under the "reasonable, articulable suspicion" standard (or otherwise).  Thus, it is

sheer speculation to suggest that records of calls to or from Plaintiffs either have been or ever

will be retrieved or reviewed through queries of the database, much less exploited by the

Government to glean driver's license, credit history, or other information about Plaintiffs, or

details about their familial, political, professional or religious associations.  *See* FAC ¶¶ 22, 28.

The Supreme Court's decision in *Amnesty International* addressed a similar standing

question and establishes that Plaintiffs' speculation concerning the scope and operation of

Government intelligence-gathering activities is insufficient to demonstrate their standing.  In

*Amnesty International*, various humans rights, labor, and media organizations challenged the

constitutionality of the FISA Amendments Act of 2008, which expanded the Government's

authority to intercept the communications of non-U.S. persons located abroad.  133 S. Ct. at

1144.  The organizations alleged that they interacted and engaged in sensitive communications

with persons who were likely to be considered by the Government as potential terrorists, or

persons of interest in terrorism investigations.  *See id.* at 1145–46.  They further alleged that they

would suffer harms as a result of the Government surveillance program, including a

compromised ability to "locate witnesses, cultivate sources, obtain information, and

communicate confidential information," and a need to undertake various costly measures to

avoid possible surveillance.  *Id.*

The Supreme Court, however, held that none of these alleged harms was sufficient to

confer standing, because it was "speculative whether the Government will imminently target

communications to which respondents are parties."  *Id.* at 1148.  Rather, the Court held that the

plaintiffs' claimed injury rested on a "speculative chain of possibilities," including "that the Government [would] target the communications of non-U.S. persons with whom they communicate," that the Government would succeed in intercepting those communications, and that the plaintiffs would be parties to the particular communications the Government intercepts. *Id.* at 1148–50. So, too, here. The idea that the course of unspecified Government counter-terrorism investigations would lead to particular telephone numbers; that the FISC would approve use of these numbers to conduct queries of the database, based on reasonable, articulable suspicion that they are associated with foreign terrorist organizations, and that these queries would return records of Plaintiffs' calls that NSA analysts would in turn review, is just as speculative as the allegations of harm that were rejected as insufficient in *Amnesty International.*

<strong>2.     The Court's reasoning in <em>Klayman v. Obama</em> should not be<br>followed here.</strong>

Defendants recognize that on highly similar facts in *Klayman v. Obama* this Court concluded that two plaintiffs claiming to be Verizon Wireless subscribers had standing to challenge the alleged collection and "analysis" of metadata about their telephone calls under the Section 215 program. *Klayman*, 957 F. Supp. 2d at 26–29. For the reasons that follow, Defendants respectfully submit that the Court should not follow that ruling in this case.

Turning first to the question of collection, the *Klayman* plaintiffs presented no facts to demonstrate that records pertaining to their calls had been or would be collected under the Section 215 telephony metadata program, other than the fact that they were Verizon Wireless subscribers. *Klayman*, 957 F. Supp. 2d at 26. The Court inferred, however, from the Government's explanation of the contact-chaining process, crossing multiple communications networks and time periods, that the NSA "*must* have collected metadata from Verizon Wireless .

20

. . as well as AT&T and Sprint," if the program were to serve its intended function.  *Id.* at 27 (emphasis in original).  The Court should not apply that reasoning in this case, for two reasons.

First, unlike the situation in *Klayman*, the record here contains specific evidence refuting the inference the Court made in that case.  As stated in the Shea declaration, and confirmed by the FISC, the Section 215 telephony metadata program has never captured information on all (or virtually all) telephone calls made and/or received in the United States.  *Paul* Shea Decl. ¶ 8; Aug. 29, 2013, FISC Op. at 4 n.5.  It does not follow, therefore, that the NSA must collect "metadata for all telephone calls" on the networks of "all major telecommunications companies," FAC ¶ 16, for the program to perform its function, because in fact the NSA does not collect metadata on all such calls, and collection of metadata about Plaintiffs' calls cannot be presumed on the basis of a contrary assumption.

Second, the Court should decline to apply the standing analysis in *Klayman* to this case because, Defendants respectfully submit, it is inconsistent with the Supreme Court's decision in *Amnesty International.*  There the Court insisted that plaintiffs seeking judicial review of actions taken by the Government in the field of intelligence-gathering "set forth . . . specific facts demonstrating" that communications to which they were parties would be targeted for interception, and because the plaintiffs failed to do so, the Court dismissed their claims for lack of standing.  133 S. Ct. at 1149.  Notably, the majority declined to follow the approach advocated by the dissenting Justices, who, relying on "commonsense inferences," found a "very high likelihood" that the Government would intercept at least some of the plaintiffs' communications under the challenged statute.  *Id.* at 1157 (Breyer, J., dissenting).  The dissent based its conclusion on a combination of various facts, including that the plaintiffs regularly engaged in the type of electronic communications—with and about suspected foreign terrorists, their

families and associates, and their activities—that the Government was authorized and highly motivated, for counter-terrorism purposes, to intercept, and that the record showed the Government had in fact intercepted on thousands of occasions in the past. *Id.* at 1156–59.[9]

Akin to the dissent's approach in *Amnesty International*, the Court in *Klayman* attempted to draw an inference, based on unclassified information about the general operation of the Section 215 program, that the NSA must have collected metadata about the plaintiffs' calls (or, at the very least, metadata from the plaintiffs' provider), without the benefit of facts specific to the plaintiffs demonstrating that to be the case. *See* 957 F. Supp. 2d at 27.  The decision in *Amnesty International* teaches, however, that relying solely on inferences drawn from limited information about the scope and operation of the Government's intelligence-gathering activities, is not a sufficiently "rigorous" basis on which to make a determination of standing, at least in cases such as this where litigants seek to call the constitutionality of those activities into question. *See* 133 S. Ct. at 1147.  Rather, to establish Plaintiffs' standing to challenge the acquisition of telephony metadata under the Section 215 program, the complaint must contain non-conclusory allegations demonstrating that information about their communications has been or imminently will be collected under the program. *See Brown,* 793 F. Supp. 2d at 378; *Harpole*, 668 F. Supp. 2d at 78.  As discussed above, the complaint does not do so.

Defendants respectfully submit that the standing analysis in *Klayman* regarding the query process is also inconsistent with the available facts, and precedent, and should not be followed here.  In *Klayman* the Court concluded that the plaintiffs there also had standing to challenge alleged analysis of metadata pertaining to their calls, on the basis that when the NSA queries the

---

[9] The dissent also observed that the "Government [did] not deny that it ha[d] both the motive and the capacity to listen to communications of the kind described by [the] plaintiffs." 133 S. Ct. at 1159–60.

database, "its system must necessarily analyze metadata for *every* phone number in the database by comparing the foreign target number against *all* of the stored call records to determine which U.S. phones, if any, have interacted with the target number."  957 F. Supp. 2d at 28.  The Court concluded that this use of the NSA's Section 215 database "'implicates the Fourth Amendment each time a government official monitors it,'" in the same manner as Government monitoring of the hypothetical home video camera discussed in *Johnson v. Quander*, 440 F.3d 489 (D.C. Cir. 2006).  *Id.* at 28-29 (quoting *Johnson*, 440 F.3d at 499).  The analogy, however, is not apt.

The Court of Appeals explained in *Johnson* that an in-home video camera raises Fourth Amendment concerns each time it is monitored by a government official because, each time it is so monitored, the camera reveals new and otherwise private information about the homeowner to that official.  440 F.3d at 498–99.  The same cannot be said regarding queries of the bulk telephony metadata obtained by the NSA under Section 215.  As discussed above, when the NSA runs queries of the database, the analysts see no metadata associated with anyone's calls, and thus, the analysts learn no information about the communications of any individuals, unless their telephone numbers (or other identifiers) fall within two (previously three) "hops" of a suspected terrorist selector.  *See* Shea Decl. ¶¶ 22-24; *Paul* Shea Decl. ¶¶ 4-5.  NSA's queries are more akin to the sniff of a narcotics-detection dog, which "discloses only the presence or absence of narcotics" in a person's luggage, and "does not expose noncontraband items that otherwise would remain hidden from public view, as does . . . an officer's rummaging through the [luggage's] contents."  *See United States v. Place*, 462 U.S. 696, 707 (1983) (holding that a canine sniff of luggage is not a search).  *See also United States v. Jacobsen*, 466 U.S. 109, 123 (1984) ("A chemical test that merely discloses whether or not a particular substance is cocaine

does not compromise any legitimate interest in privacy.").[10]   Therefore, absent some indication that NSA analysts conducting queries of the database, using selectors authorized by the FISC under the "reasonable, articulable suspicion" standard, have retrieved and reviewed records containing metadata associated with Plaintiffs' calls—of which there is no allegation in the First Amended Complaint—Plaintiffs cannot demonstrate that the query process itself constitutes an "*invasion* of a legally protected interest," *Defenders of Wildlife*, 504 U.S. at 560 (emphasis added), even assuming, *contra Smith v. Maryland,* 442 U.S. 735 (1979), that Plaintiffs have a protected privacy interest in telephony metadata.  *See Horton v. California*, 496 U.S. 128, 142 n.11 (1990) (government's acquisition of an item without examining its contents "does not compromise the interest in preserving the privacy of its contents"); *United States v. VanLeeuwen*, 397 U.S. 249, 253 (1970) (defendant's interest in the privacy of his detained first-class mail "was not disturbed or invaded" until the Government open the packages).[11]

---

[10] The Court's analogy of a library patron searching for every book that cites *Battle Cry of Freedom*, *Klayman*, 957 F. Supp. 2d at 28 n.38, is also distinguishable from the NSA's query process in the same critical respect.  As described in the Court's hypothetical, to find every book in the library citing *Battle Cry of Freedom*, the patron herself reviews the contents of each book in the library's collection.  In contrast, NSA analysts who query the database see no information contained in any of the call detail records stored in the database, except for the tiny fraction containing metadata within two hops of the suspected terrorist selector—as if the patron saw only those few books in the library that actually contain references to *Battle Cry of Freedom.*

[11]  The Court in *Klayman* viewed the above-quoted language from *Horton* and *VanLeeuwen* as dicta, *see* 957 F. Supp. 2d at 29 n.40, but they are in fact statements of the law.  *See, e.g.,United States v. Clutter*, 674 F.3d 980, 984 (8th Cir. 2012) (seizure of computers, subsequently found to contain child pornography, did not implicate Fourth Amendment privacy interests at time seizure occurred); *United States v. Banks*, 3 F.3d 399, 401-02 (11th Cir. 1993) ("no Fourth Amendment privacy interest in first-class mail is invaded by detaining such mail . . . until a search warrant can be obtained," because "the privacy interest in the packages" was not disturbed); *United States v. Licata*, 761 F.2d 537, 541 (9th Cir. 1985) (seizure of a closed container "affects only the owner's possessory interests and not the privacy interests vested in the contents").  *See also Texas v. Brown*, 460 U.S. 730, 748-49 (1983) (Stevens, J., concurring in the judgment) (noting that seizure of a locked suitcase does not alone "compromise the secrecy of its contents" or "implicate any privacy interests").

The "close[ ] scrutiny" required of Plaintiffs' factual allegations where the Court's subject matter jurisdiction is concerned, *Food and Water Watch*, 2013 WL 6513826, at *5, reveals that Plaintiffs have not alleged facts demonstrating with the rigor required in this context, *Amnesty International*, 133 S. Ct. at 1147, that they have standing to contest the NSA's collection or querying of bulk telephony metadata under Section 215.  The First Amended Complaint must therefore be dismissed.

## II.    THE SECTION 215 TELEPHONY METADATA PROGRAM DOES NOT VIOLATE PLAINTIFFS' FOURTH AMENDMENT RIGHTS.

The legal foundation of Plaintiffs' sole claim—that they have a reasonable expectation of privacy in the telephone numbers dialed in order to connect a telephone call, and other telephony metadata, that is protected by the Fourth Amendment—is foreclosed by the controlling and squarely applicable authority of *Smith v. Maryland*, 442 U.S. 735 (1979).  That authority, and the third-party doctrine on which it is based, remain good law today.  The factual differences between *Smith* and the telephony metadata program that Plaintiffs point to are immaterial to the reasoning of *Smith*, as the FISC recently explained in an opinion rejecting this Court's analysis in *Klayman v. Obama*, 957 F. Supp. 2d 1, in which this Court declined to follow *Smith*.  *In re Application of the FBI for an Order Requiring the Production of Tangible Things*, Dkt. No. BR14-01 at 21-22 (FISC Mar. 20, 2014) "Mar. 20, 2014 FISC Order," (Exhibit 4, hereto); *see also ACLU v. Clapper*, 959 F. Supp. 2d 724, 752 (S.D.N.Y. 2013); *United States v. Moalin*, 2013 WL 6079518, at *5–8 (S.D. Cal. Nov. 18, 2013).  Even if there were a threshold reasonable expectation of privacy in telephony metadata, contrary to *Smith*, Plaintiffs have not alleged an invasion of that interest, and the program would still pass constitutional muster as it is reasonable under the standard applicable to searches that serve special needs of the Government.

### A.      Plaintiffs Have No Protected Privacy Interest in Telephony Metadata

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  The Government's collection of bulk telephony metadata pursuant to orders of the FISC does not constitute a "seizure" of Plaintiffs' records (*see, e.g.*, FAC ¶ 16), because the orders are directed to telecommunications service providers, not to subscribers, and direct the production of what are indisputably the providers' own business records.  *See* Shea Decl. ¶ 18; *Smith*, 442 U.S. at 741 (because the government ascertained the telephone numbers dialed from a telephone by installing equipment on telephone company property, the petitioner could not claim that his property was invaded); *United States v. Miller*, 425 U.S. 435, 440-41 (1976) (rejecting a bank depositor's Fourth Amendment challenge to a subpoena of bank records because, inasmuch as the bank was a party to the transactions, the records belonged to the bank); *ACLU*, 959 F. Supp. 2d at 751 (call detail records obtained under the Section 215 telephony metadata program are created and maintained by the telecommunications providers, not the plaintiff subscribers, and are not, therefore, the plaintiff's call records).

The Fourth Amendment's proscription against unreasonable "searches" was understood "for most of our history … to embody a particular concern for government trespass upon the areas ('persons, houses, papers, and effects') it enumerates."  *United States v. Jones*, 132 S. Ct. 945, 949-50 (2012).  Since the decision in *Katz v. United States*, 389 U.S. 347 (1967), however, it has been understood that a Fourth Amendment "search" also takes place when the government's investigative activities "violate a person's 'reasonable expectation of privacy.'"  *Jones*, 132 S. Ct. at 949-50 (quoting *Katz*, 389 U.S. at 360).  In *Katz*, the Court held that the government's interception of the contents of a telephone conversation occurring in a public

26

telephone booth constituted a search under the Fourth Amendment.  The Supreme Court squarely held in *Smith,* however, that individuals have no reasonable expectation of privacy in the mere telephone numbers they dial because they knowingly give that information to telephone companies when they dial a number; the government's acquisition of those numbers did not therefore constitute a search under the Fourth Amendment.  *Smith*, 442 U.S. at 741-46.

In *Smith*, the police requested (without a warrant or court order) that the telephone company install a pen register device at its central offices to record the numbers dialed from a robbery suspect's (Smith's) home phone.  *Smith*, 442 U.S. at 737.  After Smith was arrested, he sought to suppress evidence derived from the pen register as a violation of his Fourth Amendment rights.  The Court held that even if Smith harbored a subjective expectation that the phone numbers he dialed would remain private, that expectation was not reasonable, explaining that the Court "consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties."  *Id.* at 743-44 (citing, *inter alia*, *Miller*, 425 U.S. at 441-43 (no reasonable expectation of privacy in financial records a depositor voluntarily provided to his bank)).  Telephone users "typically know that they must convey numerical information to the phone company; that the phone company has facilities for recording this information; and that the phone company does in fact record this information for a variety of legitimate business purposes."  *Id.* at 743.  By using his phone, Smith "voluntarily conveyed numerical information to the telephone company and 'exposed' that information to its equipment in the ordinary course of business," and therefore "assumed the risk that the company would reveal to police the numbers he dialed."  *Id.* at 744; *see also id.* at 745; *Miller*, 425 U.S. at 443 ("depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government.").  The Court also contrasted the collection of the

27

numbers dialed with the acquisition of the contents of communications at issue in *Katz*.  *Id*. at 741.[12]

*Smith* controls the instant case because the pen-register metadata at issue in *Smith* are "indistinguishable" from the non-content telephony metadata at issue in the Section 215 program,[13] and its rationale is fully applicable.  Mar. 20 2014 FISC Order at 11.  Defendants recognize that this Court concluded otherwise in *Klayman*, but respectfully submit for the reasons explained herein that *Smith* cannot be distinguished on the grounds cited by the Court in *Klayman*, or those asserted in the First Amended Complaint.

First, Plaintiffs do not, nor could they plausibly, allege that they did not voluntarily convey and expose phone numbers to their telephone companies in order to use the telephone.  In fact, Plaintiffs admit that they "necessarily reveal certain information to telecommunications companies with which they contract for their telephone service . . . ."  FAC ¶ 30.  Plaintiffs contend, however, that they expect that those numbers will be kept confidential and not shared with the Government.  *Id*. ¶¶ 30–31 & n.10(10), 11.  But *Smith* rejected this very argument,

---

[12] The third-party doctrine has consistently been applied to call detail records like the business records at issue here.  *See, e.g., Reporters Comm. for Freedom of the Press v. AT&T*, 593 F.2d 1030, 1043-46 (D.C. Cir. 1978); *United States v. Baxter*, 492 F.2d 150, 167 (9th Cir. 1973); *United States v. Fithian*, 452 F.2d 505, 506 (9th Cir. 1971); *United States v. Doe*, 537 F. Supp. 838, 839-40 (E.D.N.Y. 1982).  *See also U.S. Telecom Ass'n v. FCC*, 227 F.3d 450, 454 (D.C. Cir 2000) ("telephone numbers are not protected by the Fourth Amendment") (citing *Smith*).  Courts have also applied *Smith* in the Internet age to find no reasonable expectation of privacy in email "to/from" and Internet protocol ("IP") addressing information, *United States v. Forrester*, 512 F.3d 500, 510-11 (9th Cir. 2008), and in text message addressing information.  *Quon v. Arch Wireless Operating Co., Inc.*, 529 F.3d 892, 905 (9th Cir. 2008), *rev'd on other grounds*, 130 S. Ct. 2619 (2010).

[13] Just as Plaintiffs voluntarily turn over the phone numbers they dial to their phone companies, they voluntarily turn over the dates, times, and durations of their calls; the telephone numbers from which incoming calls originate are also not protected by the Fourth Amendment.  *See United States v. Reed*, 575 F.3d 900, 914 (9th Cir. 2009); *United States Telecom Ass'n*, 227 F.3d at 454, 459.  Other communications routing information collected under the program, such as trunk identifiers, is information collected or generated by the phone companies themselves.  *See* Primary Order at 3 n.1.

holding that by voluntarily conveying numerical information to the telephone company, a subscriber "assume[s] the risk that the company would reveal to police the numbers he dialed." *Smith*, 442 U.S. at 744.  This was so even if the information was revealed to the third party "'on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.'"  *Id.* (quoting *Miller*, 425 U.S. at 443); *see also SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 743 (1984) ("It is established that, when a person communicates information to a third party even on the understanding that the communication is confidential, he cannot object if the third party conveys that information or records thereof to law enforcement authorities.").  Significantly, *Miller* involved the compelled production of almost four months of a person's bank records—copies of checks, deposit slips, financial statements, monthly statements—records that are more substantive and personal in nature than phone numbers.[14] Mar. 20, 2014 FISC Order at 21-22.[15]

"If a person who voluntarily discloses information can have no reasonable expectation concerning limits on how the recipient will use or handle the information, it necessarily follows that he or she also can harbor no such expectation with respect to how the Government will use or handle the information after it has been divulged by the recipient."  Mar. 20, 2014 FISC Order at 17.  Thus, Plaintiffs' attempts to distinguish the Section 215 telephony metadata program from *Smith* based on the longer retention of the telephony metadata and the Government's ability to

---

[14] The telephony metadata program must be reauthorized every 90 days.  Shea Decl. ¶ 14. It is not, therefore, "a permanent cycle of ongoing collection," FAC ¶ 30 n.10(3), and it authorizes the acquisition of data for less time than the bank subpoena upheld in *Miller*.

[15] As the FISC pointed out, "a telephone user who is making a call fully divulges to the phone company the numbers he dials," unlike the bus passenger in *Bond v. United States*, 529 U.S. 334, 338 (2000), cited in *Klayman*, 957 F. Supp. 2d at 33 n.47, who sought to preserve the privacy of the contents of his carry-on bag by using an opaque bag and placing that bag directly above his seat.  Mar. 20, 2014 FISC Order at 16 n.8.

29

analyze it using sophisticated technology (FAC ¶ 30 n.10(4), (7)) must fail.  *See* Mar. 20, 2014 FISC Order at 14-17.

For the same reason, Plaintiffs' allegations about the relationship between the Government and the telecommunications companies (FAC ¶ 30 n.10(6)) are simply irrelevant to whether a search occurred.[16]  Mar. 20, 2014 FISC Order at 17–18.  Nor is there any factual support for this Court's conclusion in *Klayman* that the telecommunications companies that receive Section 215 orders are collecting telephony metadata for law enforcement purposes, "operat[ing] what is effectively a joint intelligence-gathering operation with the Government." 957 F. Supp. 2d at 33.  Rather, "pursuant to the FISC's orders, telecommunications service providers turn over to the NSA business records that the companies already generate and maintain for their own pre-existing business purposes (such as billing and fraud prevention)." Shea Decl. ¶ 18.  *See also* Mar. 20, 2014 FISC Order at 18 n.9 (pointing out that the Court acknowledged earlier in its opinion in *Klayman* that "the information produced to NSA consists of 'telephony metadata records . . . *which the companies create as part of their business* of providing telecommunications services to customers.'") (quoting *Klayman*, 957 F. Supp. 2d at 15).

Plaintiffs also suggest that their decisions to voluntarily convey and expose their telephone numbers to their phone companies are merely a necessity of modern life that did not exist in 1979 when *Smith* was decided.  FAC ¶ 32.  *See also Klayman*, 957 F. Supp. 2d at 36. 1979 was, of course, not that long ago, and the use of banks, credit cards, telephones, and the

---

[16] Similarly irrelevant to the analysis of whether Plaintiffs voluntarily conveyed and exposed metadata about their calls to their telecommunications companies are Plaintiffs' allegations about public opinion polls concerning the Section 215 telephony metadata program, and about state legislators introducing bills to limit their states' use in court of information obtained through warrantless intelligence-gathering activities.  FAC ¶¶ 33–34.

like, to conduct the affairs of life was clearly prevalent at that time, as both *Smith* and *Miller* demonstrate, and as the dissent in *Smith* expressly argued.  *See* 442 U.S. at 749–50 (Marshall, J., dissenting).  *See also ACLU*, 959 F. Supp. 2d at 749 n.16 (citing cases prior to 1979 holding no Fourth Amendment privacy interest in various information provided to third parties).  Plaintiffs themselves allege that 91% of households had phone lines in 1979.  FAC ¶ 30 n.10(9).  It is true that cell phones did not exist in 1979, and that cell phones are used for purposes other than making telephone calls (such as accessing the Internet, taking pictures, and text messaging).  *See id.*; *Klayman*, 957 F. Supp. 2d at 34-36.  "But none of these additional functions generates any information that is being collected by NSA as part of the telephony metadata program, which . . . involves only non-content records concerning the placing and routing of telephone calls.  Accordingly, such changes are irrelevant . . . ."  Mar. 20, 2014 FISC Order at 19.  *See also ACLU*, 959 F. Supp. 2d at 752 ("Telephones have far more versatility now than when *Smith* was decided, but this case only concerns their use as telephones."); *Klayman*, 957 F. Supp. 2d at 35 (acknowledging that the types of information acquired under the telephony metadata program are "limited" to "phone numbers dialed, date, time, and the like.").

Plaintiffs emphasize that "the sheer volume of data [collected under the telephony metadata program] is exponentially different than in *Smith*."  FAC ¶ 30 n. 10(3).  *See also Klayman*, 957 F. Supp. 2d at 30, 33 & n.48, 34, 36.  That argument "is misplaced under settled Supreme Court precedent."  Mar. 20, 2014 FISC Order at 19–20.  Fourth Amendment rights "are personal in nature, and cannot bestow vicarious protection on those who do not have a reasonable expectation of privacy in the place to be searched."  *Steagald v. United States*, 451 U.S. 204, 219 (1981); *accord Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978).  No Fourth Amendment interest of Plaintiffs is implicated, therefore, by the fact that the metadata of many

31

other individuals' calls are collected as well as (allegedly) their own.  *See United States v. Dionisio*, 410 U.S. 1, 13 (1973) (where single grand jury subpoena did not constitute an unreasonable seizure, it was not "rendered unreasonable by the fact that many others were subjected to the same compulsion"); *In re Grand Jury Proceedings*, 827 F.2d 301, 305 (8th Cir. 1987) ("[T]he fourth amendment does not necessarily prohibit the grand jury from engaging in a 'dragnet' operation."); *ACLU*, 959 F. Supp. 2d at 752 ("The collection of breathtaking amounts of information unprotected by the Fourth Amendment does not transform that sweep into a Fourth Amendment search."); *United States v. Rigmaiden*, 2013 WL 1932800, at *13 (D. Ariz. May 8, 2013) (Government did not violate defendant's Fourth Amendment rights by collecting a high volume (1.8 million) of IP addresses); Aug. 29 FISC Op. at 8–9.

Moreover, while the volume of data collected is greater here than in *Smith*, the privacy concerns were actually greater in *Smith* than here.  In *Smith*, the police targeted the phone calls of a single, known individual (Smith), in fact examined the data gathered to ascertain whether he had contacted another known individual (his victim), and used that information to arrest and prosecute him.  442 U.S. at 737.  The Court nonetheless ruled that Smith had no reasonable expectation of privacy in telephone numbers he dialed.  *Id*. at 741–42.  Here, by contrast, Plaintiffs can point to no equivalent intrusion on their privacy.  The FISC orders here direct specific telecommunications companies to provide the Government with the companies' own business records, in which Plaintiffs have no reasonable expectation of privacy.  Nor have Plaintiffs shown that any metadata of their phone calls have ever been examined by NSA analysts.  As discussed above, the NSA can only query the database of call detail records with a now judicially-approved suspected-terrorist selector and can only review metadata within two steps of that suspected-terrorist selector.  Even if any allegedly collected records of Plaintiffs'

32

calls have been among the tiny fraction of the records ever reviewed by NSA analysts, the call detail records collected by the NSA reveal only such information as phone numbers, dates and times, and routing information, but not the names, addresses, or other identifying information of parties to the calls.  *See* Mar. 20, 2014 FISC Order at 22 ("it must be emphasized that the non-content telephony metadata at issue here is particularly limited in nature and subject to strict protections that do not apply to run-of-the-mill productions of similar information in criminal investigations.").  Plaintiffs can complain of no putative invasion of privacy of the kind experienced by the petitioner in *Smith.*

Plaintiffs further allege that *Smith* is distinguishable because Smith was suspected of a crime, whereas the telephony metadata here is collected without individualized suspicion of crime.  FAC ¶ 30 n.10(1), (2).  This difference has nothing to do with whether individuals, be they criminal suspects or not, have a reasonable expectation of privacy in telephony metadata for purposes of the threshold Fourth Amendment determination of whether a "search" has occurred.  *See Smith*, 442 U.S. at 742.  Instead, the question of whether individualized suspicion is required by the Fourth Amendment is part of the reasonableness analysis that is conducted *after* a court finds a search to have occurred.  *See, e.g.*, *Klayman*, 957 F. Supp. 2d at 38.

Plaintiffs' reliance on the collection of trunk identifiers as a way to distinguish *Smith* is also misplaced.  FAC ¶¶ 17 n.5, 30 n.10(5).  Plaintiffs allege vaguely that "trunk identifying information . . . can provide a general personal location," *id.*, but even if that is so, the NSA is not authorized to access or use the information in the database, including trunk identifiers, for any purpose other than to acquire, produce, or disseminate foreign intelligence information.  Shea Decl. ¶ 8, 16-17; Primary Order at 6.   Moreover, the First Amended Complaint contains no allegation that trunk-identifying information about Plaintiffs' calls has ever been used to

ascertain their "general personal location" in violation of their putative Fourth Amendment rights. *See Rakas*, 439 U.S. at 133-34 (Fourth Amendment Rights are personal rights that cannot be asserted vicariously).

Nor does *Jones* provide any basis for departing from the controlling authority of *Smith*. Mar. 20, 2014 FISC Order at 24. As the FISC explained, the majority opinion in *Jones*, in holding that an individual has a protected Fourth Amendment interest against the police attaching a GPS tracker to his car, relied on the "physical intrusion" the tracker effected and "declined to address the question whether use of the GPS device, without the physical intrusion, impinged upon a reasonable expectation of privacy . . . ." *Id.* at 25.

Like this Court in *Klayman*, Plaintiffs rely on Justice Sotomayor's concurring opinion in *Jones* for the proposition that "[t]elephone metadata reveals a wealth of detail about Plaintiffs' and class members' familial, political, ideological, professional, religious, and other associations that are ordinarily unknown to government." FAC ¶ 28 (citing *Klayman*, 957 F. Supp. 2d at 36 (citing *Jones*, 132 S. Ct. at 955 (Sotomayor, J., concurring))).[17] But *Smith* itself recognized that a list of telephone numbers dialed "could reveal the identities of the persons and the places called, and thus reveal the most intimate details of a person's life," *Smith*, 442 U.S. at 748 (Stewart, J., dissenting), and yet the Court ruled that there is no reasonable expectation of privacy in telephone numbers dialed. Moreover, this potential is in fact less of a concern here, where the NSA does not know who the phone numbers collected under the telephony metadata program belong to and can only find out that information for phone numbers or other metadata

---

[17] The *Jones* majority opinion is, of course, controlling, and did not, as explained above, undermine the vitality of *Smith* in any way. "And the Supreme Court has instructed lower courts not to predict whether it would overrule a precedent even if its reasoning has been supplanted by later cases" (which has not occurred here). *ACLU*, 959 F. Supp. 2d at 752 (citing *Agostini v. Felton*, 521 U.S. 203, 237 (1997)).

that result from an authorized query made under the reasonable, articulable suspicion standard, and where Plaintiffs do not even claim that any metadata of their calls have been reviewed.  In contrast, the police in *Smith* knew Smith's identity when the pen register identified the phone numbers he dialed.  Similarly, in *Jones*, law enforcement officers attached a GPS device to a single, known person's vehicle, recorded the vehicle's locations over a period of time, and used that information to prosecute him.[18]

\* \* \*

Thus, *Smith* compels the conclusion that the alleged collection of metadata records about Plaintiffs' telephone calls does not constitute a search for purposes of the Fourth Amendment, thereby ending the Fourth Amendment inquiry.  But even if the Court concluded, contrary to *Smith*, that Plaintiffs have a reasonable expectation of privacy in metadata allegedly collected about their phone calls, they point to no invasion of that interest that would rise to the level of a Fourth Amendment search.

Although Plaintiffs allege in conclusory fashion that records of their calls are stored and "periodically searched" in the NSA's database, FAC ¶¶ 4, 5, 16, call detail records are not "searched" in a constitutional sense every time an electronic query of the database is performed. When such queries are conducted, the only information made available for review by human beings are the records within two hops of the suspected terrorist selectors used to initiate the queries. NSA analysts receive no information about the calls of any other individuals.  *See* Shea Decl. ¶¶ 20–26.  Thus, as discussed above, the query process is analogous, in Fourth Amendment

---

[18] Although Justice Sotomayor also stated in her concurring opinion that it may be necessary to reconsider the third-party doctrine, which she posited is ill-suited to the digital age, she expressly concluded that "[r]esolution of these difficult questions in this case is unnecessary, however, because the Government's physical intrusion on Jones' Jeep supplies a narrower basis for decision." *Jones*, 132 S. Ct. at 957. *See also* Mar. 20, 2014 FISC Order at 28.

terms, to a canine sniff to ascertain "the presence or absence of narcotics" in a person's luggage, which the Supreme Court has held does not constitute a search because it "does not expose noncontraband items that otherwise would remain hidden from public view." *Place*, 462 U.S. at 707. *See also Jacobsen*, 466 U.S. at 123 (chemical test that only reveals to law enforcement officials whether a particular substance is cocaine does not compromise any legitimate interest in privacy).

Because Plaintiffs have not alleged that information associated with any of their phone calls has been reviewed by analysts in response to queries of the bulk telephony metadata collected by the NSA, they cannot maintain that NSA queries of the database intrude upon any putative expectation of privacy they claim to have in that information.   For this reason as well, Plaintiffs have not been subjected to a search for purposes of the Fourth Amendment, once again bringing the Fourth Amendment inquiry to a close.

### B.        The Telephony Metadata Program Is Reasonable

Even if the operation of the Section 215 telephony metadata program results in a "search" as to Plaintiffs, the Fourth Amendment bars only "unreasonable" searches and seizures.  The Section 215 telephony metadata program is reasonable under the standard applied to assess suspicionless searches that serve special government needs.  As the Supreme Court has explained, "where a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." *NTEU v. Von Raab*, 489 U.S. 656, 665–66 (1989).  More specifically, the scope of the privacy interest and the character of the intrusion are balanced against the nature of the government interests to be furthered, the

immediacy of the government's concerns regarding those interests, and the efficacy of the program in addressing those concerns.  *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 658, 660, 662-63 (1995).

The telephony metadata program clearly serves special governmental needs above and beyond normal law enforcement.  The undisputed purpose of the telephony metadata program is identifying unknown terrorist operatives and preventing terrorist attacks—forward-looking goals that fundamentally differ from most ordinary criminal law enforcement, which typically focuses on solving crimes that have already occurred, not preventing unlawful activity and protecting public safety and national security.  *See, e.g.*, *United States v. U.S. Dist. Court (Keith)*, 407 U.S. 297, 322-23 (1972); *In re Sealed Case*, 310 F.3d 717, 746 (FISC-R 2002).

If, contrary to *Smith*, Plaintiffs could be said to have any Fourth Amendment privacy interest that is implicated by the mere collection of non-content telephony metadata, that interest would be minimal.  Moreover, the intrusion on that interest would be mitigated still further by the statutorily mandated restrictions on review and dissemination of the metadata that are written into the FISC's orders.  Primary Order at 4-14.  *See also Maryland v. King*, 133 S. Ct. 1958, 1979 (2013); *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 U.S. 822, 833 (2002); *Vernonia*, 515 U.S. at 658.

On the other side of the balance, the collection and review of telephony metadata promote overriding public interests.  The interest in identifying and tracking terrorist operatives for the purpose of preventing terrorist attacks is a national security concern of overwhelming importance.  *See Haig v. Agee*, 453 U.S. 280, 307 (1981) ("[N]o governmental interest is more compelling than the security of the Nation.") (internal quotation marks omitted); *In re Directives*, 551 F.3d 1004, 1012 (FISC-R 2008) (Government interest in national security "is of the highest

order of magnitude."); *ACLU*, 959 F. Supp. 2d at 754.  That interest cannot be as effectively

achieved by conditioning access to telephony metadata on individualized suspicion, because such

a requirement would not permit the type of historical analysis, contact-chaining, and timely

identification of terrorist contacts that the program makes possible.  *See* Shea Decl. ¶¶ 44–63;

Aug. 29 FISC Op. at 20-22; *ACLU*, 959 F. Supp. 2d at 747–48.  Imposing an individualized

suspicion requirement on this program, is not only "impracticable" but may also be entirely

infeasible.  *Von Raab*, 489 U.S. at 665–66.

## CONCLUSION

For the reasons stated above, Plaintiffs' complaint should be dismissed.


Dated: May 2, 2014


Respectfully submitted,

STUART F. DELERY
Assistant Attorney General

JOSEPH H. HUNT
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Branch Director

_/s/ James J. Gilligan_____
JAMES J. GILLIGAN
Special Litigation Counsel
MARCIA BERMAN
Senior Trial Counsel
BRYAN DEARINGER
Trial Attorney
RODNEY PATTON
Trial Attorney
JULIA BERMAN
Trial Attorney

U.S Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W., Room 6102
Washington, D.C.  20001
Phone: (202) 514-3358
Fax: (202) 616-8470

Counsel for Defendants